**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0390n.06
Filed: May 12, 2005

**No. 03-5258**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| Julian Neal Riddick, | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |

**Before:  GUY and ROGERS, Circuit Judges, and DOWD, District Judge[*].**

**Dowd, District Judge.**  This is an appeal by the government, filed pursuant to the provisions of 18 U.S.C. § 3231 from the granting of defendant Julian Neal Riddick's motion to suppress evidence obtained as a result of the May 1999 execution of search warrants issued by Chief Judge James Todd. The warrants authorized the search of Riddick's home, truck, and office at Planters Bank in Maury City, Tennessee, where he served as Vice President.  Following the May 1999 searches, the defendant, along with two other defendants, Robert Thomas and Danny Lovelace, was eventually indicted on February 26, 2001 and charged with four counts of

---

[*]The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

mail fraud and one count of conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 1341 and 371.

On November 13, 2001, after receiving discovery materials, Riddick filed a motion to suppress.[1] Magistrate Judge J. Daniel Breen conducted the evidentiary hearing on January 29, 2002 and, on June 28, 2002, recommended denial of the motion to suppress as to the search of Riddick's home and office and a granting of the motion as to the search of Riddick's truck. After Riddick filed an objection to the Recommendation, Judge Bernice B. Donald conducted an additional evidentiary hearing on November 15, 2002. Then on January 21, 2003, Judge Donald ordered the suppression of all evidence seized in the searches of defendant's home and office. The government filed a timely notice of appeal on February 13, 2003. Briefing was suspended until March 22, 2004 when Judge Donald issued the promised memorandum opinion supporting the suppression order. We reverse the order of suppression and remand for further proceedings. Our analysis follows.

I.      The Affidavit for the Search Warrant

A 13-page affidavit was sworn to by FBI Special Agent Christopher Gicking in support of the issuance of two search warrants. His affidavit described four separate instances of

---

[1] The indictment of Riddick, Thomas, and Lovelace was assigned to Chief Judge Todd. On December 20, 2001, Chief Judge Todd referred the pending motion to suppress to Magistrate Judge Breen and referred a ruling on any objections to Magistrate Judge Breen's Report and Recommendation to United States District Court Judge Bernice Donald. Judge Todd's order also indicated that after the motion to suppress was resolved, he would conduct all further proceedings.

apparent criminal conduct on the part of Riddick, a bank official of Planter's Bank. Paragraphs 3 through 17 pertained to claims that Riddick was involved with a Danny Cobb to obtain a $300,000 FHA-Guaranteed Loan and to use the proceeds to pay off an allegedly improperly handled loan of $200,000 issued by Planters Bank on the authority of Riddick.

The second scheme alleged that Riddick accepted cash payments on bank loans to Pete Turnage that had been taken off the books of Planters Bank as uncollectible and as described in paragraph 19.

The third scheme detailed Riddick's alleged participation with a Wiley Hutcherson, Jr. in extensive check kiting at the Planters Bank and which included fraudulent loans from other banks for $200,000 and $250,000 and as described in paragraphs 20 through 32.

The final paragraphs, 33 through 38, dealt with the subject matter of the conspiracy count in the indictment and are included for emphasis:

> (33) Hutcherson stated [that] he had been told by someone that RIDDICK had approached an individual unknown to him (Hutcherson) about burning a house in order to collect the insurance proceeds. Hutcherson stated RIDDICK had asked him once in the past if he knew of anyone who would burn a house. Hutcherson could not provide any more specific details.

> (34) On 3/11/1999, a confidential informant (CI), whose identity has been disclosed to the district court, [*i.e.*, Danny Lovelace,][2] *advised* [Tennessee Bureau of Investigation Special Agent] Michael Frizzell *that RIDDICK was involved with a house fire that occurred on 08/26/1998 at 561 Dogwood Drive in Decaturville, Tennessee. The CI stated RIDDICK had prior knowledge that the residence was going to burn. The CI advised RIDDICK, Danny Lovelace and Robert Harlan*

---

[2]Material in brackets has been added.

*Thomas had planned to burn the residence in order to collect the insurance proceeds and pay off a mortgage.* The CI stated the mortgage was held by RIDDICK at Planters Bank. The CI advised Delmer Lovelace had secured the loan from RIDDICK at Planters Bank but had transferred the Deed of Trust to his brother, Danny Lovelace. The CI advised the deed was transferred upon the advice Danny Lovelace received from RIDDICK. The CI stated once the deed transfer had taken place, Delmer Lovelace faxed the information along with insurance papers to RIDDICK at the Planters Bank from telephone number 901-852-4189 and that this took place sometime in April 1998. [Agent] Frizzell confirmed that a call to Planters Bank in Maury City was placed from telephone number 901-852-4189 on 4/21/1998 at 8:33 am. [Agent] Frizzell also confirmed that no other calls were placed to Planters Bank from that telephone number during April 1998. *CI advised RIDDICK and Thomas gave Lovelace $10,000 cash to purchase furniture to place in the residence in Decaturville before it was burned.* CI advised RIDDICK and Thomas obtained $10,000 through a loan from another bank. He/she did not know the name of the bank but believed it was located in Dyersburg, Tennessee. CI advised subsequent to the arson he observed the insurance papers regarding the house at 561 Dogwood Drive in Decaturville at Thomas's office in Alamo. On 05/11/1999 CI confirmed these insurance papers are still at Thomas's office.


(35) Investigator Johnny Hayes of the Tennessee State Bomb and Arson Section advised [Agent] Frizzell an investigation was initiated on 08/28/1998 regarding a residential fire at 561 Dogwood Drive. *Hayes advised the investigation was to determine the cause and origin of the fire and it was determined the fire was an incendiary fire.* Hayes advised that he had the reports of Walt Kunkel, who was representing Allstate insurance company in regards to this fire. Hayes advised Kunkel traveled to Maury City, Tennessee on 12/01/1998 to meet with RIDDICK at Planters Bank. Hayes advised Kunkel attempted to question RIDDICK about the loan documents of Delmer Lovelace and Danny Lovelace in regards to the property located at 561 Dogwood Drive but RIDDICK stated Planters Bank only held the Deed of Trust & Promissory Note reflecting that Delmer Lovelace borrowed $99,955.50 from Planters Bank. Hayes advised Kunkel reported that RIDDICK refused to answer any questions and failed to produce any documents.


(36) Hayes advised [Agent] Frizzell that he and Investigator Randy Lipford traveled to Maury City, Tennessee, on 4/22/99 to meet with RIDDICK at Planters Bank. Hayes advised he and Lipford attempted to speak with RIDDICK in regards to loan documents Planters Bank held in regards to Delmer Lovelace and the property located at 561 Dogwood Drive. Hayes advised RIDDICK referred Hayes and Lipford to his attorney. Hayes advised before he and Lipford left the

4

bank he (Hayes) observed a folder with Delmer Lovelace's name on it in the filing cabinet in RIDDICK's office.

(37) Investigators have confirmed RIDDICK's participation and knowledge in the nominee loans to Hutcherson and *his participation and knowledge in the arson at the house at 561 Dogwood Drive in Decaturville, Tennessee through electronic surveillance.*

(38) On 08/19/1997 [Tennessee Bureau of Investigation Special Agent] Jolley was in RIDDICK's residence at Route 1, Pete Tinsley Road, Alamo, Tennessee and observed numerous papers, documents and boxes scattered inside the house. The experience of the investigators in this case has been that personal records are normally kept in an individual's residence.

(Emphasis added.)

II.      The Initial Order of the District Court

Judge Donald's initial order rejecting in part the Report and Recommendation stated succinctly as follows:

> This matter is before the Court on Defendant Julian Neal Riddick's Objections to the Magistrate Judge's Report and Recommendation ("Report") which recommended granting in part and denying in part Defendant's Motion to suppress. Defendant contends that this Court should reject the magistrate judge's report insofar as it recommends denying suppression. Defendant contends that the affidavit in support of the search warrant was insufficient to establish probable cause absent the false statement and therefore violated the <u>Franks</u> doctrine. <u>See</u> <u>Franks v. Delaware</u>, 438 U.S. 154 (1978). Plaintiff has filed a response to Defendant's objections.

> After an evidentiary hearing, and upon consideration of the entire record de novo, *for the reasons set forth in the separate memorandum to be filed*, the [sic] finds that the affidavit in support of the search warrant contained false statements and material omissions made with reckless disregard for the truth. *The false and misleading statements, and the failure to apprize Judge Todd of the informant's*

5

*true background and character, denied Judge Todd the opportunity to evaluate the trustworthiness of the information which provided the probable cause for the issuance of the search warrant. Once the false and misleading statements are excluded, no probable cause exists to support the issuance of the search warrant.*

Accordingly, Defendant's objections to the Report and Recommendation are sustained, and Defendant's motion to suppress is granted.

(Emphasis added.)

III.     A Summary of the District Court's Separate Memorandum in Support of Suppression

Judge Donald focused on three areas in the separate memorandum opinion. First the opinion found that the person described in paragraph 34 as the CI was, as admitted by the government, Danny Lovelace and that the government failed to provide information to Chief Judge Todd that it had pertaining to Lovelace's lack of credibility or veracity based on prior felony convictions, his state of depression, his possession of firearms even though he was a convicted felon, his threats to other individuals, his addiction to Klonopin, and his recent arrests. Secondly, the opinion held that the government had misrepresented, with reckless disregard for the truth that it had corroborated Lovelace's allegations in two instances. The first misrepresentation dealt with the sentences within paragraph 34 which declared:

> The CI stated once the deed transfer had taken place, Delmar Lovelace faxed the information along with insurance papers to RIDDICK at the Planters Bank from telephone number 901-852 4189 and this took place sometime in April 1998. SA Frizzell confirmed that a call to Planters Bank in Maury City, was placed from telephone number 901-852-4189 on 04/21/1998 at 8:33am. SA Frizzell also confirmed that no other calls were placed to Planters Bank from that telephone number during April 1998.

6

It was subsequently developed that the number was the main phone number to Planters Bank and not a fax and thus, as Judge Donald held, the affidavit conveyed a false statement that a fax transmission from Lovelace to the Defendant was "confirmed" by the government.

The second misrepresentation as found by Judge Donald related to paragraph 37 which declared that "investigators have confirmed RIDDICK's participation and knowledge in the nominee loans to Hutcherson and his participation and knowledge in the arson at the house at 561 Dogwood Drive in Decaturville, Tennessee through electronic surveillance." The content of the surveillance tapes was disclosed in the evidentiary hearings. After considering the tapes, Judge Donald, after again questioning the reliability of Danny Lovelace, stated that "[e]ven if the Court assumes that Defendant's repeated warnings demonstrated that he knew about Lovelace's involvement in the arson after it occurred, these warnings do not show Defendant's *ex ante* knowledge of or participation in the arson." Judge Donald eventually concluded that "paragraph 37 contains a false or materially misleading statement in violation of <u>Franks</u> and requires a rereading of the affidavit, with paragraph thirty-seven removed, to assess whether a substantial basis remains for finding probable cause for the two search warrants" and then after examining paragraphs 13, 33, 35, and 36 concluded that no probable cause remained to support the issuance of the search warrants.

IV.     A Summary of the Government's Position on Appeal

The government argued in its brief and at oral argument that the statements by the CI, *i.e.*, Danny Lovelace were made in the context of his admissions against his penal interest and thus were entitled to be considered on the issue of probable cause, contrary to the position of the district court. Secondly, the government took the position that the surveillance tapes clearly support the proposition

7

that Riddick was involved in bank fraud schemes while conceding that the use of the word "confirmed" in paragraph 37 as to Riddick's "participation . . . in the arson . . . through electronic surveillance" overstated the substance of the tapes, but that the tapes demonstrate Riddick's involvement in a bank fraud scheme.

V.      A Summary of the Applicable Law

The Supreme Court has decided a number of cases where the defendant contended that the search conducted pursuant to the issuance of a search warrant was constitutionally flawed because the information advanced in support of the search warrant by the affiant was insufficient, as a matter of law, to establish the requisite probable cause necessary to justify the issuance of the search warrant by the independent judicial officer, normally identified as the magistrate.

We pause to review some of the major pronouncements regarding search warrants under attack in the context of the standard of review involving suppression orders. These cases hold that the fact calls of trial judges are reviewed for clear error while law calls are reviewed on a de novo standard.

Jones v United States, 362 U.S. 257, 270-71 (1960), announced that reviewing courts, in weighing the decision of the judicial officer to issue a search warrant, should accord the finding of the judicial officer to authorize the issuance of the search warrant considerable deference. See also United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (holding that the issuing judge's findings of probable cause are required to be given "great deference"). The subsequent case of United States v. Ventresca, 380 U.S. 102, 108 (1965), teaches that judicial officers in determining whether to issue a search warrant are not required to confine their evaluations within legalistic boundaries but instead may

8

use their common sense.  Spinelli v. United States, 393 U.S. 410, 419 (1969), opined that the requisite probable cause requires only a finding of probability of criminal activity, not a prima facie showing thereof.

The decisions in Aguilar v. Texas, 378 U.S. 108 (l964), and Spinelli focused on the necessity to support information based on an informant's revelation by some additional investigation.  Aguilar and Spinelli placed additional burdens on the affiant and numerous decisions grew out of the Aguilar and Spinelli decisions.

In the wake of the restricting decisions of Aguilar and Spinelli came the decision in United States v. Harris, 403 U. S. 573 (1971), which held that statements of an informant, which constituted admissions against his penal interest, supported issuance of the search warrant.  Chief Justice Burger, in writing for the Court, observed:

> Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements.  People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions.  Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search.

Id. at 583 (plurality opinion).[3]

The next major relevant decision in the Supreme Court's Fourth Amendment jurisprudence was Franks v. Delaware, 438 U.S. 154 (1978).  Franks allows, under very strict standards, an inquiry into the

---

[3]Although this language is contained in a plurality opinion to which Justice Stewart did not join, Justice Stewart did join a part of the opinion stating that the "accusation by the informant was plainly a declaration against interest." Id. at 580.

issue of whether the affiant for the search warrant made knowingly and intentionally, or with reckless disregard for the truth, false statements in the affidavit. In the event of such a finding, it becomes necessary to determine if probable cause remains after the deletion of the false statement. However, in finding that such an inquiry could be made by way of an evidentiary hearing, Justice Blackmun, writing for the majority, declared:

> In sum, and to repeat with some embellishment what we stated at the beginning of this opinion: There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. *Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.* On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

Id. at 171-72 (emphasis added).

Franks v. Delaware was followed by Illinois v. Gates, 462 U.S. 213 (1983), and the totality of the circumstance's test was announced as the Court stated:

> [W]e reaffirm the totality-of-the-circumstances analysis that traditionally has informed probable-cause determinations. . . . The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and

"basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

Id. at 238-39 (internal citations omitted).

VI.     The Absence of Compliance with the Requirements of Franks v. Delaware by the Defendant's Counsel

The Motion to Suppress was filed in November 2000 after it was obvious to Riddick's counsel by his examination of the surveillance tapes referred to in paragraph 37 of the affidavit that the confidential informant identified to Chief Judge Todd was in fact the co-defendant Danny Lovelace.

Riddick did not request a Franks hearing in his motion to suppress, and no other defense effort was made to comply with the requirements contained in Justice Blackmun's opinion.[4]  As a

---

[4]The critical part of the Motion to Suppress follows:

(a) The affidavit providing the basis of "probable cause" for the search warrant was and is defective in that there is absolutely no corroboration of the confidential informant's reliability or veracity to establish probable cause.  There is nothing in the affidavit to provide the "basis of knowledge" of the confidential informant, no indication that the confidential informant had previously provided reliable information to law enforcement, nor is there any factual basis upon which to base a belief in the confidential informant's veracity.

(b) In the absence of any evidence of reliability, veracity, or basis for the knowledge of the confidential informant appearing in the affidavit, there must be facts set forth in the affidavit, independently known by the affiant or some investigative officer or agent of the government upon which the affidavit relies to corroborate the information provided by the confidential informant.  In this case, the only alleged confirmation or corroboration of the confidential informant occurs in the following statement found at page 11:

The CI stated that once the deed transfer had taken place, Delmar Lovelace faxed the information along with insurance papers to Riddick at the Planters Bank from telephone number 901-852-4159 and that this took place sometime in April 1998.

S.A. Frizzell confirmed that a call to Planters Bank in Maury City, was placed from

(continued...)

11

practical matter, the dissent of Justice Rehnquist in <u>Franks</u> accurately predicted the possible misuse of

<u>Franks</u> when he stated:

> The Court's opinion in this case carefully identifies the factors which militate against the result which it reaches, . . . and I am thoroughly persuaded that the barriers which the Court believes that it is erecting against misuse of the impeachment process are frail indeed.

---

[4](...continued)
telephone number 901-852-4189 on 04/21/1998 at 8:33 a.m. S.A. Frizzell also confirmed that no other calls were placed to Planters Bank from that telephone number during April, 1998.

(c) The obvious representation of the affiant is that the call placed from the telephone number of Delmar Lovelace (901-852-4189) on April 21, 1998 confirmed that the facsimile had been sent to Planters Bank from that telephone number in April of 1998. This statement was and is false and misleading. In fact, the evidence known to the investigator was that the telephone number called on April 21, 1998 at Planters Bank from (901) 852-4189 was not the facsimile number of the bank. (See attached telephone record produced by the government through SA Frizzell). The bank's facsimile number was and has been for more than nine years 656-2212. Indeed, since 656-2212 was the actual facsimile number of Planters Bank and only one call was made to Planters Bank during April 1998 from the above number, this one call refutes rather than corroborates the information provided by the alleged confidential informant.

(d) The only other corroboration or confirmation of the confidential informant's information is provided in paragraph 37 of the affidavit which provides, in pertinent part:

> (37) Investigators have confirmed Riddick's . . . . [sic] participation and knowledge in the arson at the house on 561 Dogwood Drive in Decaturville, Tennessee, through electronic surveillance.

(e) Pursuant to Rule 16 discovery, the United States has provided audio tape recordings of what purport to be the "electronic surveillance" made by the government in this case. It is respectfully submitted that nothing contained in the electronic surveillance corroborates the confidential informant's statement nor indicates Neal Riddick's knowledge of or participation in the arson prior to its occurring. Indeed, the electronic surveillance (audio tape recordings) negate such information.

(f) *Since the alleged corroboration of the information provided by the confidential informant provided in the affidavit used to establish "probable cause" for issuance of the search warrant is either false or misleading, the above statements in the affidavit are, therefore, false, and/or, at least, recklessly made. These false, misleading, and recklessly made statements were material evidence and necessary to convince the Magistrate under Rule 41 that there was probable cause to issue the search warrant related to the charges here because such statements were used to corroborate the confidential informant's information.*

(Emphasis added.)

12

. . .

> The Court has commendably, in my opinion, surrounded the right to impeach the affidavit relied upon to support the issuance of a warrant with numerous limitations. My fear, and I do not think it an unjustified one, is that these limitations will quickly be subverted in actual practice. . . . I greatly fear that this generalized language will afford insufficient protection against the natural tendency of ingenious lawyers charged with representing their client's cause to ceaselessly undermine the limitations which the Court has placed on impeachment of the affidavit offered in support of a search warrant. I am sure that the Court is sincere in its expressed hope that the doctrine which it adopts will not lead to 'any new large-scale commitment of judicial resources, but. . . .

438 U.S. at 180-81, 187.

The primary focus of the Motion to Suppress was a challenge to the credibility of the confidential informant, *i.e.*, the co-defendant Danny Lovelace, and lacked any substantial compliance with the requirements imposed by Franks for a hearing. However, as both Magistrate Judge Breen and Judge Donald proceeded with the Franks v. Delaware inquiry, we shall address the rulings in our analysis.

VII.   The District Court's Decision to reject the statements of the CI, *i.e.*, Lovelace

The failure to advise the magistrate, *i.e.*, Chief Judge Todd, of the background of Lovelace does not justify the district court's rejection of the information supplied by Lovelace, as supplying the information was clearly against his penal interest. See Harris, 403 U.S. at 583-584.[5]

_____

[5]Chief Judge Todd swore agent Gicking to the truthfulness of the information in the thirteen page affidavit and in paragraph 34 of the affidavit Gicking swore that the identity of the informant had been disclosed to the court. A common sense reading of that statement concerning disclosure to the court would make a reference to Chief Judge Todd who swore the

(continued...)

13

Riddick and the district court focused on the failure of Agent Gicking to advise Chief Judge Todd of the past criminal conduct of Lovelace, his propensity for drinking, and his depression. Riddick contends that the teachings of United States v. Williams, 224 F.3d 530, 532 (6th Cir. 2000), require that law enforcement officials must "present evidence from which the [issuing] judge can conclude from the totality of the circumstances, 'including the veracity and basis of knowledge of persons supplying hearsay information, [that] there is a fair probability that contraband or evidence of a crime will be found in a particular place."

The Supreme Court in Gates set out the basis for Williams' general statement as to "veracity and basis of knowledge," but the teachings of Harris inform that basic principle. Williams, in particular, related to hearsay statements by persons unknown to the law enforcement officials or mere informants who themselves make no self incriminating statements. Cases that rely on Harris are too numerous to

[5](...continued)
affiant. It is also a common sense interpretation of the proceeding and with deference to the magistrate, *i.e.*, Chief Judge Todd, that he was informed by affiant that Danny Lovelace was the person identified as the confidential informant. As a consequence when Chief Judge Todd read in particular the provisions in paragraph 34 he knew that the confidential informant, *i.e.*, Danny Lovelace, was providing information against his penal interest in the context of the teachings of Harris.

Agent Gicking was first questioned about the disclosure of Danny Lovelace as the CI to Chief Judge Todd on January 29, 2002 in the evidentiary hearing before Magistrate Judge Breen. Gicking indicated a belief that the identity of Danny Lovelace was revealed to Chief Judge Todd. (See JA 324.) Gicking was again questioned on November 15, 2002 in the hearing before Judge Donald and again advised that Chief Judge Todd was told that the CI was Danny Lovelace. (See JA 482.) Michael Frizzell, a special agent for the Tennessee Bureau of Investigation also testified in both evidentiary hearings. He testified that he was present with Agent Gicking and AUSA Grinald when the affidavit of Gicking was presented to Chief Judge Todd and that he identified Danny Lovelace as the CI, but not under oath and that Chief Judge Todd inquired if Danny Lovelace was a mechanic. (See JA 369.) Agent Frizzell repeated similar testimony before Judge Donald in the second evidentiary hearing. (See JA 512-513.) In a further attempt to discredit Danny Lovelace, and after he had been indicted as a co-defendant, Riddick called Danny Lovelace as a witness in the evidentiary hearing before Judge Donald. (See JA 527-535.)

14

cite but see as examples: United States v. Czuprynski, 46 F.3d 560, 564 (6th Cir. 1995) (affiant's statement against penal interest that she smoked marijuana with the defendant "bears intrinsic evidence of credibility" and supports search warrant); United States v. Chafin, 622 F.2d 927, 930 (6th Cir. 1980) (informant's statements contained sufficient indicia of truthfulness to support search warrant even though informant did not admit to all of the elements of the crime because his statements were "a dangerous admission, one that he would not lightly make, and in doing so he was placing critical evidence in the hands of the prosecutors"); United States v. Rosenbarger, 536 F.2d 715, 719 (6th Cir. 1976) (probable cause for the issuance of a search warrant where affidavit contained information from informant implicating herself in criminal activity); United States v. Soriano, 361 F.3d 494, (9th Cir. 2003) (informant's statements deemed reliable because they amounted to admissions of criminal activity, and, therefore, sufficient grounds to issue search warrant existed).

We note that a warrantless arrest and the ensuing search of a person based on the self-incriminating statement of a co-defendant passes constitutional muster and subsequent motions to suppress fail. See United States v. Wright, 16 F.3d 1429 (6th Cir. 1994); United States v. Tarazon, 989 F.2d 1045 (9th Cir. 1993); United States v. Wilson, 964 F.2d 807 (8th Cir. 1992). If a warrantless arrest and seizure of the body of the arrested person, without the intervention of a judicial officer, is supported by our precedent, it seems strange that when the law enforcement official requests the issuance of a search warrant, based in part on the statement of an identified confidential informant whose statement is against his penal interest, the veracity of the confidential informant should become, as in this case, the primary focus.

15

In our view, the statements of the confidential informant did not require corroboration to justify the issuance of the search warrant because Lovelace's statements against his penal interest, coupled with the detail of his statement and his basis for knowledge, as well as the other alleged instances of bank fraud, were sufficient to support a finding of probable cause.

VIII.   The District Court's Determination that the reference by the affiant to the fax constituted a false statement that was knowingly and intentionally made or with reckless disregard for the truth

Magistrate Judge Breen's report and recommendation focused on the fact that the affiant Agent Gicking relied on information supplied by a fellow agent and called the reference an act of negligence. We need not pause on this issue because, even if we adopt Judge Donald's analysis, the balance of the affidavit justified the issuance of the warrants.

IX.   The District Court's Ruling concerning the surveillance tapes as referenced in Paragraph 37 of Gicking's Affidavit

Riddick's counsel attacked the credibility and veracity of the CI, *i.e.*, Danny Lovelace, at the suppression hearing conducted by Magistrate Judge Breen. Counsel then undertook an attack on the efforts of Gicking to corroborate the CI, *i.e.*, Lovelace, by demonstrating the inaccuracy of the alleged fax number at the bank. Counsel also attacked the representations of the affiant in paragraph 37 with respect to the conclusions reached regarding Riddick's participation in and knowledge of the arson of the residence. During the hearing before Magistrate Judge Breen on January 29, 2002, Riddick's counsel indicated that he had copies of the surveillance tapes and argued that any rational person listening to the tapes would find that they refute corroboration and thus constituted a misrepresentation to Chief Judge Todd about corroboration. (See JA 346.) Later during the suppression hearing, seven

16

surveillance tapes were introduced into the record (JA 376) marked as Collective Exhibit 4.[6] At the

conclusion of the hearing before the magistrate-judge, both sides indicated that they would provide

transcripts of the surveillance tapes. On March 2, 2002, counsel for Riddick filed a document described

as "Transcript of Audio Cassettes" and indicated it contained the transcripts of seven tapes dated March

2, March 18, March 22, March 29, April 16, April 26 and May 20, 1999. ( Docket # 122.) The

document was at some time given Bates-stamped page numbers and both Magistrate Judge Breen and

Judge Donald made references in their respective opinions to statements in the transcripts by reference

to the Bates numbered pages rather than to the Collective Exhibit 4.

Both Magistrate Judge Breen and Judge Donald devoted a great deal of attention to the

transcripts in the context of whether the affiant had misrepresented the nature of the statements of

Riddick in the context of paragraph 37.

The Report and Recommendation of Magistrate Judge Breen concluded:

> Based on the statements made on the tapes, it is the court's view that Gicking's
> representation in the search warrant affidavit that electronic surveillance
> confirmed Riddick participated in and had knowledge of the arson was not
> unsupported. In addition, the comments referred to by the defendant concerning
> drinking and Marla Lovelace's possible involvement in the blaze were offhand
> and, in the context of the conversations in which they were made, were not
> sufficient to result in serious doubts on the part of the affiant as to the truth of the
> allegations contained in the affidavit.

---

[6]Transcripts of five of the tapes are included in the Joint Appendix which detail the recorded conversation between Riddick and Hutcherson on 3/2/99; the recorded conversation between Lovelace and co-defendant Thomas on 3/22/99; the recorded conversation between Riddick and Lovelace on 3/29/99; the recorded conservation between Riddick and Lovelace on 4/16/99; and the recorded conversation between Riddick and Lovelace on 4/26/99.

17

(JA 431.)

Judge Donald, however, reached a different conclusion.  In her Memorandum Opinion of  March 22, 2004, Judge Donald concluded that "the surveillance tapes cannot support paragraph thirty-seven's claim that electronic surveillance allowed investigators to confirm [Riddick's] participation and knowledge in the Dogwood Drive arson." (JA 591.)

> Defendant never admitted on tape any involvement in the arson and/or mail fraud. Moreover, . . . at no point in his four recorded conversations with [Riddick] does Lovelace mention his own culpability, let alone [Riddick's] facilitation of this culpability.  The most incriminating statements made by [Riddick] (and Thomas) consisted of their warnings to Lovelace that he should deny knowledge of what caused the fire. . . .

> The absence of any statement by [Riddick] of his direct participation in the arson and/or mail fraud stands in stark contrast to the myriad cases supporting a finding of probable cause based on admissions in surveillance tapes. . . .

> Additionally, [Riddick] was trying to collect insurance proceeds for the bank on its status as lienholder/third party beneficiary.  He appeared to have trouble getting the insurance company to pay the claim, so his warnings to Lovelace - assuming he had no knowledge of Lovelace's involvement in the arson - may have come from his legitimate fiduciary interest in getting the bank its money as quickly and efficiently as possible. . . .

> Even if the Court assumes that [Riddick's] repeated warnings demonstrated that he knew about Lovelace's involvement in the arson after it occurred, these warnings do not show [Riddick's] *ex ante* knowledge of or participation in the arson. . . . [T]he Court finds that the statements made do not rise to the level of 'confirming' [Riddick's] 'participation and knowledge in the arson at' the Dogwood Drive house.  Had the affidavit stated that the surveillance tapes 'indicated' or 'suggested' [Riddick's] involvement, the Court would be more inclined to accept the statement.

(JA 589-91.)  As a result of this conclusion, Judge Donald further concluded that "paragraph thirty-seven contains a false or materially misleading statement in violation of <u>Franks</u> and requires a re-reading of the affidavit, with paragraph thirty-seven removed, to assess whether a substantial basis remains for finding probable cause for the two search warrants." (JA 591-92.)

> Because Agents Gicking and Frizzell listened to the conversations and reviewed the surveillance tapes prior to writing the affidavit and swearing to its veracity before the issuing judge, they knew, or should have known, that paragraph thirty-seven misstated the value of the electronic surveillance tapes. Finally, paragraph thirty-seven's statement is highly material because, in addition to the fax transmission false statement, it contains the only corroboration of Lovelace's veracity and reliability within the affidavit.  As a result, paragraph thirty-seven contains a false or materially misleading statement in violation of <u>Franks</u> and requires a re-reading of the affidavit, with paragraph thirty-seven removed, to assess whether a substantial basis remains for finding probable cause for the two search warrants.

(JA 591-92.)

The effort undertaken by both Magistrate Judge Breen and Judge Donald with respect to the surveillance tapes to determine whether Agent Gicking had misstated the value of the tapes in attempting to corroborate Lovelace's declaration was unnecessary.  Even with Agent Gicking's statement regarding the electronic surveillance excised, the affidavit contained sufficient information from Lovelace to support a finding of probable cause.

     X.     <u>Conclusion</u>

For the foregoing reasons, the order of suppression is REVERSED and this case is REMANDED for further action.[7]

---

[7]Riddick had advanced other claims in support of the motion to suppress. Judge Donald did not pass on those claims, and Riddick did not raise, by way of cross-appeal, a failure of Judge Donald to address those additional claims. We find that issues of suppression with regard to the issuance of the search warrant have been resolved and thus return this case to Judge Todd for trial.