FILED

07/28/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 7, 2020

**STATE OF TENNESSEE v. GARY CAMPBELL**

**Appeal from the Criminal Court for Shelby County**
**No. 17-03945    Jennifer Johnson Mitchell, Judge**

_____

**No. W2019-00626-CCA-R3-CD**

_____

The State appeals as of right from the trial court's order dismissing the indictment against the Defendant, Gary Campbell. See Tenn. R. App. P. 3(c)(1); State v. Meeks, 262 S.W.3d 710, 721 (Tenn. 2008). Campbell was indicted by the Shelby County Grand Jury for one count of sexual exploitation of a minor. See Tenn. Code Ann. § 39-17-1003. Campbell filed a motion to suppress, claiming that the search warrant affidavit failed to establish probable cause for the search of his residence. Following an evidentiary hearing, the trial court granted the motion to suppress and dismissed Campbell's indictment. On appeal, the State argues that the trial court erred in granting the suppression motion and in dismissing the indictment because (1) the affidavit in support of the search warrant for Campbell's property was sufficient to establish probable cause and (2) exigent circumstances supported the search. After carefully reviewing the record and the applicable law, we reverse the order of the trial court granting the motion to suppress, vacate the order dismissing the indictment, and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Devon D. Lepeard and Sara Poe, Assistant District Attorneys General, for the Appellant, State of Tennessee.

Phyllis Aluko, District Public Defender; Harry E. Sayle III (on appeal) and Michael Johnson (at hearing), Assistant District Public Defenders, Memphis, Tennessee, for the Appellee, Gary Campbell.

**OPINION**

On November 1, 2018, Campbell filed a motion to suppress the evidence obtained from a search of his residence pursuant to a search warrant. As grounds for this motion, Campbell argued the only basis for the search warrant was a statement from a criminal informant, Andrew Galbreath; that Galbreath had no prior contact with police, which prevented the police from assessing his credibility or the reliability of his information; that the police failed to corroborate Galbreath's statement; that no information concerning Campbell was in the Google report to the National Center for Missing and Exploited Children (NCMEC) regarding a single pornographic image uploaded to Galbreath's email address; and that although Galbreath had told the police that he had received pornographic images from Campbell and that he had sent Campbell pornographic images, there was no information in the search warrant affidavit for Campbell's home about when receipt or delivery of the pornographic material occurred and no information concerning the email address Campbell used to deliver or receive the pornographic material.

On November 26, 2018, the State filed its response to the motion to suppress, contending that Galbreath was not a criminal informant but a defendant in a linked investigation, a classification which did not require the same inquiry into reliability and did not require corroboration. Because Galbreath "gave a statement against his own interest" incriminating himself in a crime and implicating Campbell in a similar crime, the State argued Galbreath's statement was inherently reliable. See United States v. Harris, 403 U.S. 573, 584 (1971) ("Concededly admissions of crime do not always lend credibility to contemporaneous or later accusations of another. But here the informant's admission that over a long period and currently he had been buying illicit liquor on certain premises, itself and without more, implicated that property and furnished probable cause to search."); United States v. Riddick, 134 Fed. Appx. 813, 822 (6th Cir. 2005) (concluding that an identified confidential informant's statements against penal interest did not require corroboration to justify the issuance of the search warrant because the informant's statements, when coupled with the detail of the informant's statements and his basis of knowledge, as well as the other alleged instances of bank fraud, were sufficient to support a finding of probable cause for the search warrant affidavit). Nevertheless, the State acknowledged the holding in State v. Bishop, 431 S.W.3d 22, 39-40 (Tenn. 2014), wherein the Tennessee Supreme Court rejected the federal courts' view that an accomplice's confession that implicates another is sufficient for a finding of probable cause and reaffirmed that the Aguilar/Spinelli test[1] should be used when determining whether a

---

[1] This test arose from two United States Supreme Court cases, Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969).

- 2 -

suspect's self-inculpatory statement gives the police probable cause to arrest a person identified by the suspect. In light of the Tennessee Supreme Court's adoption of the Gates[2] totality-of-the-circumstances analysis in State v. Tuttle, 515 S.W.3d 282 (Tenn. 2017), the State urged adoption of the federal view that an accomplice's confession implicating another is sufficient for a finding of probable cause, which would make the search warrant in Campbell's case valid based on Galbreath's statement. Alternatively, the State argued that even if the trial court refused to adopt the federal view for Galbreath's statement, the search warrant in Campbell's case was valid under the totality-of-the-circumstances test, explaining:

> Here, the Memphis Police Department was investigating a cybertip which indicated that Andrew Galbreath was in the possession of, and indeed, uploading child pornography. They obtained a search warrant and did in fact find child pornography in his residence. Andrew Galbreath confessed to possessing the child pornography, and to the additional crime of exchanging it with [Gary Campbell,] the Defendant in this case. Galbreath gave the police detailed information about [Campbell], including his description, age and where he lived. The details given by Andrew Galbreath in and of themselves suggest reliability. Moreover, the Memphis Police Department corroborated [Galbreath]'s information by locating [Gary Campbell], of the same description, living in the same place that Andrew Galbreath asserted he lived. They corroborated that by the Lexis Nexis search and by having [Galbreath] look at a [G]oogle map and point out the apartments where he lived. It has been clearly stated by the Tennessee Supreme Court that the information [provided by an informant] may be buttressed by independent corroboration of details. Noted in Bishop, "it is not necessary to corroborate every detail of the informant's information . . . or to 'directly link the suspect to the commission of the crime.' Corroboration of 'only innocent aspects of the story['] may suffice.["] Id. at 29.

**Search Warrant Affidavit.** At the November 26, 2018 suppression hearing, the State introduced into evidence the search warrant affidavit and search warrant for Campbell's residence. The affiant, Sergeant Christopher Vaden, detailed his lengthy employment history with the Memphis Police Department and the Drug Enforcement Administration as well as his extensive qualifications, training, and certifications in digital technology and computer-related crime. Sergeant Vaden asserted that the affidavit was submitted in support of an application for a search warrant of Campbell's residence, which was located at 5[***] Meadow Lake Drive South Apartment 3A, Memphis, Shelby County,

---

[2] See Illinois v. Gates, 462 U.S. 213 (1983).

Tennessee 38115, and that there was probable cause to believe that Campbell had in his possession or control certain types of equipment, devices, computers, cellular telephones, records, files, and documents that could contain material depicting the sexual exploitation of a minor.

Sergeant Vaden also described the characteristics common to individuals involved in the receipt and collection of child pornography in the affidavit, including that "individuals who wish to obtain child pornography do so by ordering it from abroad or by discreet contact with other individuals who have it available," that "the use of computers and/or cellular telephones to traffic in, trade, collect child pornography and obscenity has become one of the preferred methods of obtaining obscene and child pornographic materials," that images of child pornography are "intrinsically valuable as trading/selling material and therefore are rarely destroyed or deleted by the individual collector," that collectors of child pornography may use sexually explicit or suggestive materials "to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts," that "[c]hild pornography collectors . . . may correspond with and/or meet others to share information and materials" and "often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography."  Sergeant Vaden noted that searching and seizing information from computers and cellular telephones requires officers to seize most or all electronic storage devices so that these devices can be searched later by a qualified computer expert in a laboratory or other controlled environment, a process that can take "weeks or months, depending on the volume of data stored."

Sergeant Vaden next described in the affidavit the evidence obtained over the course of his investigation, including the July 12, 2016 tip from NCMEC regarding a complaint from Google, Inc. involving an image of a "child approximately three years old performing oral sex on an adult male" that was uploaded to Andrew Galbreath's email address MorbidStillWorks@gmail.com; the September 8, 2016 tip from NCMEC involving Galbreath that included "a lascivious exhibition image of a known 5 year old female"; the property collected pursuant to a search warrant of Galbreath's property executed on September 9, 2016, which included two computers, two phones, a paper tablet, two thumb drives, and "a pink striped [bed]sheet that was believed to be used in the image of the 5 year old [contained in the September 8, 2016 tip from NCMEC];"  Galbreath's transport to the police station and interview by officers the same day; and Galbreath's waiver of rights and confession to "having distributed the image depicting a child approximately three years old performing oral sex on an adult male."

Sergeant Vaden then detailed his basis for believing that Gary Campbell's residence would contain images depicting the Sexual Exploitation of a Minor offense:

- 4 -

Galbreath also stated he sent the image [of the three[-]year[-] old child engaged in oral sex on an adult male that was involved in the July 12, 2016 NCMEC tip] and nude images of minors to a male, white, Gary Campbell, date of birth 9-13-1952, who resides at an apartment complex at Mt. Moriah and Mendenhall. Investigators checked . . . Campbell's name through Lexis Nexis (a data base which contains current and historical addresses for credit histories for individuals) and developed the address of 5[***] Meadow Lake Drive South Apartment 3A, Memphis, Tn. Galbreath viewed a Google Map of that address and identified that set of apartments as being Campbell's apartment.

After noting in the affidavit that a personal computer or cellular telephone was a "natural repository for information and collections," Sergeant Vaden stated that "the varying unlimited uses of these devices make it probable that evidence of dominion, ownership and control of the devices and files thereon may be found in varying electronic forms." He then stated the following in the affidavit:

Your affiant states that based upon the facts set forth above that it is more likely than not that an electronic device capable of storing digital media, utilized by a Gary Campbell at 5[***] Meadow Lake Drive South Apartment 3A, Memphis, TN 38115 will store the graphic image files referred to above, depicting the sexual exploitation of a child less than 18 years of age. Even if a resident at 5[***] Meadow [L]ake Drive South Apartment 3A, Memphis, TN 38115 has "deleted" the graphic image[] files or placed them on portable disks or media, it is more likely than not, based upon my experience, training, and the training of other forensic computer experts, that the graphic image[] files will remain on the device's internal storage device (internal hard drive) for a period of time.

Sergeant Vaden requested that a forensic technician be granted authorization to examine and duplicate images/copies of the above electronic media and to determine if evidence of the sexual exploitation of a minor offense were contained therein. At the conclusion of the affidavit, Sergeant Vaden asked the court to issue the search warrant because he had "reason to believe and does believe that a Gary Campbell of 5[***] Meadow [L]ake Drive South Apartment 3A, Memphis, TN 38115 is in possession of child pornography in violation of Tennessee Code Annotated [section] 39-17-1003" and because "there is probable cause to believe that [Campbell's] property will contain evidence or tends to demonstrate that said persons participated in the commission of violation of TCA [§] 39-17-1003, Sexual Exploitation of a Minor."

- 5 -

**Suppression Hearing Testimony.** At the suppression hearing, Lieutenant James Taylor and Sergeant Christopher Vaden testified for the State. Lieutenant Taylor, an investigator with the Internet Crimes Against Children Task Force of the Memphis Police Department, testified that he first became involved in this case when his partner at the time, Sergeant Vaden, began working on a complaint from NCMEC regarding Andrew Galbreath, an individual associated with the Defendant, Gary Campbell. He said that Google had reported evidence of possible child pornography to NCMEC, who then provided two cybertips to the Memphis Police Department that included the pornographic images. Lieutenant Taylor said that the first tip from NCMEC, which was received in July 2016, concerned an image of child pornography that was uploaded to a Google server by Galbreath. He said the second tip from NCMEC, which was received in September 2016, involved Galbreath emailing a pornographic image of his own daughter. Lieutenant Taylor said that because the second tip involved an identified child who they believed was in danger, the police "stepped up [their] investigation a little bit further."

Lieutenant Taylor said that Galbreath was arrested in September 2016, and once he was confronted about sending the pornographic images, Galbreath waived his Miranda rights, identified his daughter as the minor in one of the pornographic images, and said that he had sent this image of his daughter to Campbell. Galbreath explained that he took the image of his daughter with his cell phone and then texted this image to Campbell. Galbreath also told Lieutenant Taylor that Campbell sent him a pornographic image of Campbell's granddaughter. During the interview, Galbreath identified a picture of Campbell and confirmed Campbell's address on Google maps. Lieutenant Taylor explained that Galbreath had been to Campbell's apartment because Galbreath and Campbell "were in a relationship." Lieutenant Taylor said that he was able to obtain a photograph of Campbell either through an investigative tool or through the Tennessee Driver's License database. He also said that he used Memphis Light Gas and Water records to confirm Campbell's address. In addition, Lieutenant Taylor said that Galbreath described Campbell's Toyota Camry, which allowed the police to further develop Campbell as a suspect in this case.

Lieutenant Taylor acknowledged that at the time that Sergeant Vaden applied for the search warrant for Campbell's residence, Galbreath's statement to police provided the only evidence that Campbell had received pornographic material. However, he stated that the police were able to confirm Campbell's identity with the photograph and were able to confirm Campbell's address with a Google map and from Galbreath's description of Campbell's car. Lieutenant Taylor admitted that at the time that he obtained the search warrant for Campbell's property, he had not looked at Galbreath's email or cell phone to confirm what messages Galbreath had sent to Campbell or received from Campbell. He said that while officers had seized Galbreath's computers and cell phone at the time of

Galbreath's interview, the forensic evaluation of these devices had not been completed. Lieutenant Taylor acknowledged that he had never met Galbreath before Galbreath was arrested and gave his written confession. He also acknowledged that at the time the police applied for the search warrant for Campbell's residence, neither Google nor NCMEC had given any information that Campbell was involved in child pornography.

Lieutenant Taylor stated that officers took Galbreath into custody during a traffic stop and that Sergeant Vaden and other officers executed a search warrant for Galbreath's house around the time of Galbreath's arrest. Lieutenant Taylor explained that after he interviewed Galbreath and developed information on Campbell, Sergeant Vaden applied for the search warrant for Campbell's property the same day. A few hours later, Sergeant Vaden obtained and executed the search warrant for Campbell's residence. Lieutenant Taylor said that he was present when the search warrant for Campbell's property was executed and that as the search warrant was being executed, Campbell returned to his house, and officers took all of his devices and drives and then informed Campbell that they would be in touch with him at a later date. Lieutenant Taylor acknowledged that the officers never asked Campbell for his passwords to gain access to the material on these devices and drives.

Lieutenant Taylor said that it can take as long as several weeks to complete a forensic evaluation of a cell phone. He also said that Galbreath, during his interview, gave a cell number for Campbell, rather than an email. When asked if he verified Campbell's cell phone number, Lieutenant Taylor replied, "I'm sure I did, but I cannot remember exactly. I usually try to." After Galbreath gave him a description of Gary Campbell, Lieutenant Taylor obtained a photograph of the person he believed to be the same Gary Campbell, and Galbreath confirmed that the person in the photograph was the same Gary Campbell to whom he referred during his interview. Lieutenant Taylor said Galbreath also told him where Gary Campbell lived, and he was able to view Campbell's address on Google Maps, and Galbreath confirmed that the map location was where Campbell resided. Lieutenant Taylor also confirmed Campbell's address through LexisNexis. Lieutenant Taylor said that Galbreath was not working as an informant when he gave his statement to the police and that Galbreath had simply given his confession as to his part in this crime.

Sergeant Christopher Vaden testified that when he was working on this case, he was a forensic examiner assigned to the Sex Crimes, Special Victim's Unit, Internet Crimes Against Children, and Human Trafficking Task Force. When he received the July 2016 tip from NCMEC that a person had sent a pornographic image, he began issuing subpoenas for the Internet Protocol (IP) address included in the NCMEC tip. Sergeant Vaden explained that if a person is using the internet, they will have an IP address that relates back to them as a subscriber of the service. He added that after the police received the July 2016 NCMEC tip containing the IP address, they discovered that the subscriber linked to that IP

address was Galbreath. Sergeant Vaden said that while the July 2016 NCMEC tip showed that Galbreath had sent pornographic images, officers were not able to determine where Galbreath sent them, although they were able to determine that Galbreath sent these images through Galbreath's Gmail address, which was MorbidStillWorks@gmail.com.

Sergeant Vaden said they received a second tip in September 2016 from NCMEC that contained an image involving Galbreath's daughter with an IP address showing Galbreath as the subscriber. He said they were able to identify Galbreath's daughter in this image by reviewing Galbreath's social media profile. Also, in September 2016, Sergeant Vaden said he obtained and executed a search warrant for Galbreath's home, and Galbreath was arrested almost simultaneously with execution of the search warrant for his home. When Galbreath was arrested, Sergeant Vaden obtained Galbreath's cell phone and Galbreath later gave his consent for a search of his phone. Sergeant Vaden also obtained Galbreath's computers during the execution of the search warrant, although he did not have access to Galbreath's email because he did not have a search warrant that covered his email. He also said he never obtained a search warrant for Galbreath's email because he "didn't see a need to."

Sergeant Vaden said that Galbreath admitted he sent the pornographic image of his daughter, which was included in the NCMEC tip, to Gary Campbell. Sergeant Vaden said he did not examine Galbreath's email to confirm where he sent the email containing this image because Sergeant Vaden did not have a search warrant for Galbreath's email. He reiterated that "all of the information that we had from Gmail came from the two NCMEC tips." He also acknowledged that once Galbreath gave his statement indicating that he had been using email to transfer pornographic images, Sergeant Vaden had grounds to get a search warrant for Galbreath's email but did not actually obtain such a search warrant.

Sergeant Vaden said he obtained a search warrant for Campbell's property, and at the time he presented an affidavit for Campbell's search warrant, he had the NCMEC tip that pornographic material had been transferred by email and Galbreath's statement that he had sent a pornographic image to Campbell but did not have any pornographic images of Campbell's granddaughter or any other pornographic images that Campbell allegedly sent. He confirmed that at the time he completed the affidavit for Campbell's search warrant, he had not examined Galbreath's emails to see where they had been sent[.]" Sergeant Vaden stated, "At the time, we had information that Gary Campbell was possibly exploiting his granddaughter. That created a—kind of a sense of urgency for us, and so that's why we went with the search warrant." He added, "When it's involving the possibility of a child victim, we have a sense of urgency. There's liability involved. That was not an option." Sergeant Vaden said he knew the date that Galbreath claimed he sent the email with the pornographic image to Campbell but asserted that he would have had to obtain and execute a search warrant on Google in order to search Galbreath's emails, which would have been

a "three-month process." He explained that emails were not stored locally on the computers themselves but on the servers of Google and confirmed that he never pursued a search warrant for Galbreath's emails to execute on Google. Sergeant Vaden reiterated that neither of the two NCMEC tips concerned Gary Campbell.

Sergeant Vaden asserted that the reason he obtained and executed a search warrant for Campbell's property just a few hours after the police arrested and interviewed Galbreath was because there was "[a] child being exploited." He confirmed that Campbell was not arrested until it was determined that he had child pornography. Sergeant Vaden said that upon conducting a forensic examination of two of the thumb drives that were seized pursuant to the search warrant for Campbell's residence, he found "over 1,200 images of child pornography." He stated that the reason he applied for a search warrant for Campbell's property, rather than an arrest warrant for Campbell, was that he was trying to determine whether Campbell actually had child pornography based on the information Galbreath had provided.

On January 9, 2019, the defense filed a reply to the State's response. In it, the defense argued that Galbreath was a criminal informant rather than a pure citizen informant or concerned citizen informant; that Tennessee does not recognize a different category of informants who make statements against interest, see United States v. Riddick, 134 Fed. Appx. 813 (6th Cir. 2005); that the information in the affidavit did not satisfy the Gates totality-of-the-circumstances analysis adopted in Tuttle because the State failed to establish the informant's basis of knowledge and the informant's credibility or reliability; and that the State failed to present any evidence showing the existence of exigent circumstances that would overcome the deficiencies in both of the Aguilar/Spinelli prongs.

At the January 18, 2019 hearing, the trial court engaged in a comprehensive analysis of the law as applied to the facts of the case and ultimately granted Campbell's motion to suppress. The court's findings of fact, in relevant part, are as follows:

> [Lieutenant] Taylor told us that Mr. Galbreath came in, and when he . . . was questioned, he gave his information willingly. And so even though he gave incriminating statements, which he did, and he said that he . . . sent this . . . [pornographic] photo [of a minor] to [the Defendant]. But the fact that he is a codefendant and . . . is part of the criminal milieu he puts himself [into] a category which requires some reliability and credibility.

> And . . . that's where this analysis stands as far as what the magistrate knew at the time this warrant was signed. So in State v. Bishop—and they tried to use the label codefendant, because the . . . person in State v. Bishop was a codefendant. Bishop determined that a confidential informant was

- 9 -

someone who gives tips for money or favors and is a person that puts himself in the criminal milieu and somebody who may have an axe to grind, and I thought that was particularly important.

And with the fact that he may be a codefendant and someone who is a part of the criminal milieu, Bishop . . . determined that that information is presumptively suspect and not reliable, and so it was determined there that the credibility of the confidential informant must be established. Now . . . , in assessing and analyzing that information, the Courts all go back to the . . . Aguilar-Spinelli factors, and Tennessee has taken a totality of the circumstances approach, but they still say you analyze it under Aguilar-Spinelli.

And attorneys need to understand that I struggled with this, and it's . . . a close call, but looking at the factors set out in Aguilar-Spinelli, adopted in [Jacumin] . . . .

The affidavit must set out the basis for the information or the knowledge, and it must set out the basis establishing the informant['s] credibility or a basis establishing that the informant's information is reliable. So in further reading of Bishop, the basis of knowledge prong involves how the informant came to know the information he or she claims to know. The information that Mr. Galbreath claimed to know about [the Defendant] came from their dealings with each other, whether it was face to face or just through electronic communications.

. . . .

State v. Bishop tell[s] us that []statements of a person who confessed to a crime to implicate another in the process should not be considered presumptively reliable. If not presumptively reliable, then reliable by independent evidence." And so I searched and searched and searched to try to see what independent evidence meant. In State v. Moon, . . . [a] 1992 case . . . the Criminal Court of Appeals found that there was insufficient corroboration.

They found that the informant had [a] sufficient basis of knowledge to state that there was marijuana in the residence that he had gone and purchased marijuana from and see [sales] and that type of thing, but they found that as to the veracity prong, it must come from the affiant's claim that the [informant's] information is reliable [or that the informant] has given

information against his penal interest. And in th[at] case, . . . the affiant ha[d] checked the information and found it to be correct.

In our case with [the Defendant] and Mr. Andrew Galbreath, Mr. Galbreath made a statement against penal interest, but the affiant, Sergeant Vaden, didn't do anything to corroborate information. He corroborated that [the Defendant] was the person that Mr. Galbreath had identified, and he corroborated his address. At the time of the statement, they had two computers, two phones, a paper tablet, and two thumb drives.

At some point, it's my opinion that . . . Sergeant Vaden as the affiant here should have done something to corroborate what Andrew Galbreath was telling them. They—some pictures from phones, e-mail address—they said that . . . Mr. Galbreath was being cooperative, possibly looking through his e-mail to determine . . . if e-mails had been sent back and forth, something to corroborate what Mr. Galbreath was saying.

What must be shown in the affidavit are underlying circumstances from which the magistrate can conclude that the informant is credible or the information is reliable, and we had none of that. In State v. Pierce, Criminal Court of Appeals, 2015 case, they found that the codefendant had firsthand knowledge of . . . the robbery that he had participated in, of course.

But they . . . stated that "the affidavit failed to indicate the basis of the codefendant's credibility or reliability of his information,["] because he was a codefendant.[] They go on to state that "the affidavit made no claim that the codefendant had previously provided accurate information to law enforcement or [was] other[wise] credible[,] such that the magistrate could infer his information was reliable[] because he was a credible person."

The problem is . . . that we can't assume that a codefendant is credible. He's part of the criminal milieu. It's also important to understand that . . . the Court[s] make a distinction that not every fact or piece of information given be corroborated. I got that. I understand that, but it's also important that some information be corroborated.

The fact that he gave a name and an address it's not enough information. [Moon states], "Affiant must make [a] sufficient disclosure of events, activities, or allegations which have been corroborated in . . . order that the magistrate [may] make a neutral and detached determination that the informant is credible or that his information is reliable." Mr. Galbreath made

- 11 -

a statement that he sent the [pornographic] image [of a minor] to the [the Defendant].

The record shows that prior to the order granting the motion to suppress, the State never argued that exigent circumstances supported the search of Campbell's property or asked the trial court to consider the exigent circumstances issue when ruling on the suppression issue. Consequently, the trial court, in granting the motion to suppress, made no findings as to the existence of exigent circumstances in this case.

On January 18, 2019, the same day it issued its oral ruling, the trial court entered a written order granting Campbell's motion to suppress. Then, on March 29, 2019, the trial court entered an order dismissing Campbell's indictment and a judgment dismissing Campbell's charge of exploitation of a minor. On April 9, 2019, the State filed a timely notice of appeal from the order dismissing Campbell's indictment. See Tenn. R. App. P. 3(c)(1). The case is now properly before this court for review.

## ANALYSIS

**I. Probable Cause to Support Search Warrant.** The State argues that the trial court erred in granting the motion to suppress and dismissing the indictment because the affidavit in support of the search warrant was sufficient to establish probable cause to search Campbell's home. In particular, the State asserts the trial court erred in ruling that Galbreath's tip was not presumptively reliable pursuant to State v. Bishop, 431 S.W.3d at 22, and the two-pronged Aguilar/Spinelli test in State v. Jacumin, 778 S.W.2d 430 (Tenn. 1989). It claims that the trial court, in erroneously relying on Bishop, disregarded the fact that the Tennessee Supreme Court in Tuttle overruled Jacumin, upon which Bishop relied, and adopted the totality-of-the-circumstances analysis used by the United States Supreme Court in Illinois v. Gates, 462 U.S. at 213. The State also claims that the Tennessee Supreme Court, in choosing to apply the federal totality-of-the-circumstances analysis, implicitly adopted the prevailing view under federal law that the statement of a person who confesses to a crime and implicates another in the process is presumptively reliable and sufficient to establish probable cause. See United States v. Harris, 403 U.S. at 583; United States v. Leppert, 408 F.3d 1039, 1042 (8th Cir. 2005); United States v. Brown, 366 F.3d 456, 459 (7th Cir. 2004); State v. Adrian Valenzuela, No. 2 CA-CR 2008-0398, 2010 WL 626694, at *7 (Ariz. Ct. App. Feb. 23, 2010), perm. app. denied (Ariz. Jan. 4, 2011). The State asserts that when Galbreath's tip is considered presumptively reliable, the magistrate had more than substantial evidence, which was not stale, to conclude that a search of Campbell's residence would uncover evidence of wrongdoing. The State also asserts that even if the trial court had considered Galbreath's statement under the totality-of-the-circumstances analysis, the evidence should not have been suppressed because Galbreath had a basis of knowledge because he sent the images of child pornography to Campbell,

because Galbreath established his credibility by incriminating himself in his statement, because Galbreath had no incentive to lie to the officers, and because the police were able to corroborate some non-incriminating details of the tip.

In response, Campbell argues that this court should affirm the trial court's orders granting the suppression motion and dismissing his indictment because the search warrant affidavit lacked probable cause under the totality-of-the-circumstances analysis. In particular, Campbell asserts that Galbreath's credibility as an informant from the criminal milieu was questionable and subject to heightened scrutiny; that Sergeant Vaden's affidavit contained nothing to corroborate Galbreath's claim that he had sent a pornographic image of his daughter to Campbell; that Sergeant Vaden had no history with Galbreath and provided no evidence to prove Galbreath's credibility or the reliability of his information; that Galbreath was only able to identify Campbell and tell Lieutenant Taylor where Campbell lived because Galbreath and Campbell had been in a relationship; that neither Sergeant Vaden nor Lieutenant Taylor had any information, other than Galbreath's statement, linking Campbell to the possession or trafficking of child pornography; that the only information Sergeant Vaden had at the time he prepared the search warrant were the NCMEC tips involving Galbreath and Galbreath's statement that he sent child pornography to Campbell; that Sergeant Vaden never obtained a search warrant for Galbreath's email account and never asked Galbreath for his email password to corroborate Galbreath's claim that he sent images of child pornography to Campbell.

While we recognize that this is a close case, we nevertheless agree with the State and conclude that the affidavit was sufficient to establish probable cause to search Campbell's residence under the totality-of-the-circumstances analysis adopted in Tuttle. Although the trial court initially acknowledged that "Tennessee has taken a totality of the circumstances approach," it then asserted that "the Courts . . . still say you analyze [Galbreath's statement that he sent Campbell child pornography] under Aguilar-Spinelli." The trial court then determined, mistakenly relying on Bishop, that the statement of a person who confesses to a crime and implicates another must be analyzed under "the factors set out in Aguilar-Spinelli, adopted in [Jacumin.]" In doing so, the trial court neglected to recognize that Tuttle overruled Jacumin, upon which Bishop relied. The trial court then stated that "[t]he affidavit must set out the basis for the information or the knowledge, and it must set out the basis establishing that the informant's information is reliable.[IV, 10]" It next asserted that "[t]he second prong of Aguilar-Spinelli talks about the [informant's] veracity, and it requires facts that demonstrate either that the informant is personally credible or that the information itself is reliable" and acknowledged that "the credibility of the informant's information may be buttress[ed] by independent corroboration of the details." After applying the Aguilar/Spinelli test, the trial court ultimately determined that Sergeant Vaden's corroboration of Campbell's name and address was insufficient to corroborate the veracity of Galbreath's statement. Accordingly,

- 13 -

we conclude the trial court applied the Aguilar/Spinelli test, rather than the totality-of-the-circumstances analysis adopted by the Tennessee Supreme Court in Tuttle, when determining whether the affidavit in this case established probable cause.

In determining whether the trial court erred in granting the motion to suppress in this case, we must consider the following standards that govern our review of suppression issues:

> [Appellate courts] uphold the trial court's findings of fact, unless the evidence preponderates against them. State v. Bell, 429 S.W.3d 524, 528 (Tenn. 2014) (citing State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013); State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing in the trial court "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from [the] evidence." Bell, 429 S.W.3d at 529 (citing State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); Day, 263 S.W.3d at 900; Odom, 928 S.W.2d at 23)). The application of law to facts is reviewed de novo, and the appellate court is not obliged to afford a presumption of correctness to the lower court's conclusions of law. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

Tuttle, 515 S.W.3d at 299. In determining whether probable cause supports the issuance of a search warrant, this court "'may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant.'" Id. (quoting State v. Henning, 975 S.W.2d 290, 295 (Tenn. 1998)). In addition, the appropriate standard for this court is "whether the evidence viewed as a whole provided the magistrate with 'a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" Id. (quoting Jacumin, 778 S.W.2d at 432) (citing Gates, 462 U.S. at 236; Spinelli v. United States, 393 U.S. 410, 419 (1969)).

Under both the Fourth Amendment to the United States Constitution[3] and Article I, Section 7 of the Tennessee Constitution,[4] search warrants shall not issue "unless a neutral and detached magistrate determines that probable cause exists for their issuance." Id. (citing Gates, 462 U.S. at 240; Henning, 975 S.W.2d at 294; Jacumin, 778 S.W.2d at 431). Article I, Section 7 of the Tennessee Constitution has been consistently interpreted as "'identical in intent and purpose'" to the Fourth Amendment. Id. at 307 (quoting Jacumin, 778 S.W.2d at 435); see State v. Willis, 496 S.W.3d 653, 719 (Tenn. 2016); State v. Davis, 484 S.W.3d 138, 143 (Tenn. 2016).

The State must establish probable cause to obtain a search warrant under both the United States Constitution and the Tennessee Constitution. However, the Tennessee Supreme Court recognized the difficulty in articulating exactly what probable cause means. Tuttle, 515 S.W.3d at 299-300. "Probable cause is more than a mere suspicion but less than absolute certainty." State v. Reynolds, 504 S.W.3d 283, 300 (Tenn. 2016) (citations and internal quotation marks omitted). Significantly, "'the strength of the evidence necessary to establish probable cause . . . is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt.'" Tuttle, 515 S.W.3d at 300 (quoting Bishop, 431 S.W.3d at 41). In other words, "'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" Gates, 462 U.S. at 235 (quoting Spinelli, 393 U.S. at 419). The probable cause standard is "practical, nontechnical" and "focuses upon the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act[.]" Reynolds, 504 S.W.3d at 300 (citations and internal quotation marks omitted). "'Determinations of probable cause are extremely fact-dependent.'" Tuttle, 515 S.W.3d at 300 (quoting State v. Bell, 429 S.W.3d 524, 534-35 (Tenn. 2014)).

---

[3] The Fourth Amendment, applicable to the States through the Fourteenth Amendment, states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

[4] Article I, Section 7 of the Tennessee Constitution provides:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Tenn. Const. Art. I, § 7.

In Tennessee, "[a] sworn and written affidavit containing allegations from which a magistrate may determine whether probable cause exists is an 'indispensable prerequisite' to the issuance of a search warrant." State v. Saine, 297 S.W.3d 199, 205-06 (Tenn. 2009) (quoting Henning, 975 S.W.2d at 294). "The affidavit must include facts from which the neutral and detached magistrate may determine, upon examining the affidavit in a commonsense and practical manner, whether probable cause exists." Tuttle, 515 S.W.3d at 300 (citing State v. Smotherman, 201 S.W.3d 657, 662 (Tenn. 2006); Henning, 975 S.W.2d at 294).

"'To ensure that the magistrate exercises independent judgment, the affidavit must contain more than mere conclusory allegations by the affiant.'" Id. (quoting Henning, 975 S.W.2d at 294); see Gates, 462 U.S. at 239. "An affidavit in support of a search warrant must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993). "To establish probable cause, the affidavit must show a nexus among the criminal activity, the place to be searched, and the items to be seized." Saine, 297 S.W.3d at 206 (citing State v. Reid, 91 S.W.3d 247, 273 (Tenn. 2002)); Smith, 868 S.W.2d at 572). In determining whether this nexus has been sufficiently established, we consider "whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence." Id. (citing Reid, 91 S.W.3d at 275; Smith, 868 S.W.2d at 572). A neutral and detached magistrate's probable cause determination is entitled to great deference by an appellate court. Tuttle, 515 S.W.3d at 300 (citing Jacumin, 778 S.W.2d at 431-32; Saine, 297 S.W.3d at 207).

In addition, the time of the occurrence of the facts relied upon by the affiant is an important element in establishing probable cause for the issuance of a search warrant. Id. at 301. If information in the affidavit is too old, then it is considered "stale" and will be insufficient to establish probable cause. Id. (citing W. Mark Ward, Tennessee Criminal Trial Practice, § 4.11 (2016-17 ed.)). However, there is no specific rule defining staleness, and when the illegal activity described in the affidavit is ongoing, courts have typically concluded that such an affidavit does not become stale with the passage of time. Id. (citing State v. Thomas, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991); State v. Norris, 47 S.W.3d 457, 470-71 (Tenn. Crim. App. 2000); State v. McCary, 119 S.W.3d 226, 249 (Tenn. Crim. App. 2003)).

Citizen informants also have a presumption of reliability, as long as the affidavit identifies the source of the information as a citizen informant. Tuttle, 515 S.W.3d at 301 (citing Williams, 193 S.W.3d at 507). However, "no presumption of reliability applies to

- 16 -

information supplied by an unknown informant or an informant from the 'criminal milieu.'" Id. (citing Smotherman, 201 S.W.3d at 662).

Prior to the Tennessee Supreme Court's decision in Tuttle, an officer relying in part on information from a criminal informant in a search warrant affidavit had to establish that the informant (1) had a basis of knowledge and (2) was credible or his or her information was reliable. Id. (citing Williams, 193 S.W.3d at 507). Independent police corroboration could compensate for deficiencies in either prong, see Smotherman, 201 S.W.3d at 662, and each prong had to be considered and satisfied separately to establish probable cause, see Williams, 193 S.W.3d at 507. This two-pronged test, known as the Aguilar/Spinelli test, consisting of a basis of knowledge prong and a veracity prong, originated from two United States Supreme Court cases--Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S. 410 (1969). Id. Pursuant to the Aguilar/Spinelli test, the failure to establish either prong, with or without independent corroboration, resulted in the exclusion of the criminal informant's tip from the magistrate's probable cause analysis. Gates, 462 U.S. at 227-28, 229 n.4, 230 n.5.

In 1983, the United States Supreme Court in Illinois v. Gates abandoned the Aguilar/Spinelli test in favor of a totality-of-the-circumstances analysis for deciding whether a search warrant affidavit that included an informant's tip established probable cause for issuance of a warrant. Gates, 462 U.S. at 238. In Gates, the Court held that while "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of [an informant's] report," these elements should not "be understood as entirely separate and independent requirements to be rigidly exacted in every case," but instead "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." Id. at 230. Specifically, the Court explained:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed. We are convinced that this flexible, easily applied standard will better achieve the accommodation of public and private interests that the Fourth Amendment requires than does the approach that has developed from Aguilar and Spinelli.

- 17 -

Id. at 238-39 (emphasis added) (footnote and citations omitted). The Gates Court recognized, as a part of the totality-of-the-circumstances analysis, "the value of corroboration of details of an informant's tip by independent police work." Id. at 241. It also specifically acknowledged the value of corroboration of innocent details when it reiterated that "'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Id. at 244-45 (quoting Jones v. United States, 362 U.S. 257, 269, 271 (1960)).

In 1989, in State v. Jacumin, 778 S.W.2d at 436, the Tennessee Supreme Court declined to follow the Gates totality-of-the-circumstances analysis and chose to retain the Aguilar/Spinelli test as the appropriate standard by which probable cause would be measured to determine if the issuance of a search warrant is proper under Article I, Section 7 of the Tennessee Constitution. The Jacumin court held that the Aguilar/Spinelli test, "if not applied hypertechnically, provide[d] a more appropriate structure for probable cause inquiries incident to the issuance of a search warrant than d[id] Gates" and was "more in keeping with the specific requirement of Article 1, Section 7 of the Tennessee Constitution that a search warrant not issue 'without evidence of the fact committed.'" Id.

In 2014, while Tennessee courts continued to apply the Aguilar/Spinelli test under the binding precedent of Jacumin, the Tennessee Supreme Court decided State v. Bishop, 431 S.W.3d at 22. The Bishop court held that the Aguilar/Spinelli test should be applied when deciding whether a statement of a suspect who confesses to a crime and implicates another in the process provides the probable cause for the arrest of the person implicated:

> We are aware that many courts, including most federal courts, deem an accomplice's confession sufficient for a finding of probable cause regardless of whether the confession is corroborated by other evidence. However, in State v. Jacumin, we explicitly unhitched our treatment of informants from that of the federal courts and embraced a more aporetic approach. We agreed with other jurists who had described the federal standard for assessing the reliability of informants as "unacceptably shapeless and permissive" and "nebulous" and approved the idea that "no matter how reliable or unquestionably honest an informant might be, there must be some showing of supporting facts." State v. Jacumin, 778 S.W.2d at 434-36; see also 2 LaFave § 3.4(a), at 265. Therefore, we find that the Aguilar–Spinelli test provides an appropriate lens for determining whether the self-inculpatory statement of one suspect may give police probable cause to arrest a person the suspect identifies as his or her accomplice.

- 18 -

Id. at 40 (footnote omitted). Although the Bishop court reaffirmed the appropriateness of the Aguilar/Spinelli test for determining probable cause, it emphasized the importance of independent corroboration, even of innocent details, in applying this two-prong test:

> The credibility of the informant's information may also be buttressed by independent corroboration of its details. However, it is not necessary to corroborate every detail of the informant's information, State v. Jacumin, 778 S.W.2d at 432, 436, or to "directly link the suspect to the commission of the crime." Corroboration of "only innocent aspects of the story" may suffice. State v. Melson, 638 S.W.2d at 355 (quoting United States v. Rollins, 522 F.2d 160, 164-65 (2d Cir. 1975)); see also State v. Smotherman, 201 S.W.3d 657, 664 (Tenn. 2006).

Id. at 38.

In 2017, the Tennessee Supreme Court in State v. Tuttle overruled Jacumin, in so far as it retained the Aguilar/Spinelli test, and adopted the Gates totality-of-the-circumstances analysis for determining whether an affidavit establishes probable cause for issuance of a warrant. Tuttle, 515 S.W.3d at 289, 305, 307-08. The court asserted that the Gates totality-of-the-circumstances analysis was superior to the Aguilar/ Spinelli test:

> Time has proven that the totality-of-the-circumstances analysis is not inadequate or too nebulous as a test for determining probable cause. Under Gates, "an informant's 'veracity,' 'reliability,' and 'basis of knowledge'" remain "highly relevant in determining the value of his report," Gates, 462 U.S. at 230, 103 S. Ct. 2317. But by ensuring that these factors are not viewed as entirely separate prerequisites to probable cause, requiring rigid, formulistic, and technical analysis, Gates actually improves upon the Aguilar/Spinelli test. Id. at 230-31, 103 S. Ct. 2317.

Id. at 306. Under the totality-of-the-circumstances analysis, the court reiterated that

> the informant's basis of knowledge and veracity or credibility remain highly relevant considerations. Rather than separate and independent considerations, they "should [now] be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical

- 19 -

question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." Gates, 462 U.S. at 230, 103 S. Ct. 2317. Thus, we will apply the Gates test to determine whether the affidavit sufficiently established probable cause for issuance of the warrant.

Id. at 308.

As an initial matter, although the State claims the Tennessee Supreme Court implicitly adopted the prevailing view under federal law that a statement of a suspect who confesses to a crime and implicates another in the process provides probable cause to search, the totality-of-the-circumstances analysis adopted by the Tennessee Supreme Court in Tuttle remains the appropriate standard for determining whether a search warrant affidavit is sufficient to establish probable cause. When the "totality of the circumstances" described in this affidavit are "viewed in a commonsense and practical manner," we conclude that information in this affidavit provided the magistrate with a substantial basis for determining that a search of Campbell's home would uncover evidence of wrongdoing. See id. at 310.

The supporting affidavit detailed how the investigation in this case began, namely with the two NCMEC tips that someone, later identified as Galbreath, uploaded an image of a "child approximately three years old performing oral sex on an adult male" as well as "a lascivious exhibition image of a known 5 year old female." The affidavit also summarized the information that Andrew Galbreath provided during his interview with police, specifically Galbreath's admission that he distributed the image of a "child approximately three years old performing oral sex on an adult male" and sent this particular image and other other images of child pornography to Campbell. Galbreath had first-hand knowledge that Campbell possessed child pornography because Galbreath was the person who sent the child pornography images to Campbell. In addition, Galbreath's admission, which functioned as a statement against interest, incriminated him for the offense of aggravated sexual exploitation of a minor, see Tenn. Code Ann. § 39-17-1004(a)(1), (a)(4), (b)(1), (b)(4), at the same time that it implicated Campbell for the offense of exploitation of a minor, see Tenn. Code Ann. § 39-17-1003(a), (d).

In State v. Moon, 841 S.W.2d 336 (Tenn. Crim. App. 1992), this court recognized the holding in United States v. Harris, 403 U.S. 573 (1971), that admissions of a crime may carry their own indicia of credibility sufficient to support a finding of probable cause to search, "necessarily requires that the statement against penal interest be the one which provides the reason for the search." Moon, 841 S.W.2d at 340. Without specifically adopting the holding in Harris, we do find persuasive that it was the "content" of

Galbreath's statement that "implicate[d] the targeted property," namely Campbell's home. Id. Because Galbreath incriminated himself for the aggravated sexual exploitation of a minor offense when he admitted that he distributed the image of a "child approximately three years old performing oral sex on an adult male" as well as other images of child pornography to Campbell, we believe that this carries some "weight toward enhancing the reliability of [Galbreath's] information." Id. It is also worth noting that Galbreath disclosed at least one of the images he sent Campbell was the image of child pornography that was associated with the first NCMEC tip, a fact verifiable by the police. In addition, in determining whether a nexus among the criminal activity, place to be search, and items to be seized has been sufficiently established for the purpose of probable cause, it is reasonable to consider the possibility that Campbell could have disposed of his images of child pornography if the police failed to obtain the search warrant quickly and Galbreath, following his arrest, had the opportunity to communicate with Campbell. See Tuttle, 515 S.W.3d at 300 (citing Saine, 297 S.W.3d at 206).

Moreover, based on the information in the affidavit, we do not believe it likely that Galbreath's identification of Campbell was motivated by revenge because Galbreath incriminated himself for a more serious crime at the same time he implicated Campbell in a lesser offense. While Galbreath may have hoped to receive favorable treatment in exchange for his information implicating Campbell, he had absolutely nothing to gain by giving the police false information about Campbell. We also recognize that this affidavit included a substantial amount of information regarding what Sergeant Vaden learned from his experience and training about the characteristics common to child pornographers, including the fact that child pornographers often used "computers and/or cellular telephones to traffic in, trade, collect child pornography" and that "[c]hild pornography collectors . . . may correspond with and/or meet others to share information and materials" and "often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography." The fact that Galbreath told the officers about another individual who shared his interest in child pornography closely fits with what Sergeant Vaden's training taught him about the traits common to individuals involved in the receipt and collection of child pornography.

In addition, the information in the affidavit was not stale because Sergeant Vaden applied for the search warrant for Campbell's home the same day that Galbreath implicated Campbell during his interview with police. Finally, the affidavit shows that the police independently corroborated a person by the name of Gary Campbell lived in the area identified by Galbreath and then had Galbreath confirm Campbell's exact address pursuant to a Google map. See Gates, 462 U.S. at 244-45 ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing "a substantial basis for crediting the hearsay." (quoting Jones, 362 U.S. at 269, 271)); Bishop, 431 S.W.3d at 38 ("[I]t is not

necessary to corroborate every detail of the informant's information . . . or to directly link the suspect to the commission of the crime. Corroboration of only innocent aspects of the story may suffice." (citations omitted and internal quotation marks omitted)). Accordingly, after considering the totality of the circumstances described in the affidavit, we conclude that Sergeant Vaden's affidavit sufficiently established probable cause for issuance of a search warrant for Campbell's home.

**II. Exigent Circumstances.** Because we have determined that the search warrant was supported by probable cause, we will address the remaining issues only in the event of further appellate review. The State argues that even if the search warrant affidavit were insufficient to establish probable cause, the search of Campbell's property was constitutional under the exigent circumstances exception to the warrant requirement. The State claims that regardless of whether this issue is reviewed under plenary review or plain error review, exigent circumstances allowed the police to search Campbell's property quickly, rather than waiting for months in order to obtain corroborating evidence. It asserts that this issue should receive plenary review because it properly preserved the exigent circumstances issue when it presented proof regarding the existence of exigent circumstances at the suppression hearing, which the defendant acknowledged in its post-hearing response. Alternatively, it contends that even if this court determines that the exigent circumstances issue is waived, the trial court committed plain error in suppressing the evidence against Campbell.

In response, Campbell argues that exigent circumstances did not support the search of his property. He claims the State failed to present any information that a delay of even a few weeks to conduct further investigation would result in a loss of evidence, especially in light of Sergeant Vaden's statement in the search warrant affidavit that persons who possess child pornography generally hold on to it for a substantial period of time. He also claims that the police made no effort to investigate Galbreath's claim that he sent a pornographic image to Campbell because they never obtained a warrant to search Galbreath's email, never asked Galbreath for his password to confirm whether Galbreath actually sent a pornographic image to Campbell on the date of the alleged transmission, and never obtained a warrant to search Galbreath's cell phone or electronic storage devices to cross reference what they found against Galbreath's statements about Campbell. Campbell does not address whether the State should be entitled to plenary review or plain error review on this issue.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens from unreasonable searches and seizures. U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. Consequently, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence

discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). One such exception to the warrant requirement allows police to conduct a search or seizure in the presence of exigent circumstances. Mincey v. Arizona, 437 U.S. 385, 392-93 (1978); Meeks, 262 S.W.3d at 723. However, the State has the burden of proving that a warrantless search was constitutionally permissible. State v. McElrath, 569 S.W.3d 565, 570 (Tenn. 2009) (citing State v. Ingram, 331 S.W.3d 746, 755 (Tenn. 2011)).

Exigent circumstances commonly support a warrantless search when officers act "(1) [to continue] hot pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) [to respond] to an immediate risk of serious harm to police or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury." Meeks, 262 S.W.3d at 723. The Tennessee Supreme Court has summarized the principles governing the determination of whether circumstances are sufficiently exigent to dispense with the warrant requirement:

> Exigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant. Thus, in assessing the constitutionality of a warrantless search, the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant. The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry. Mere speculation is inadequate; rather, the State must rely upon specific and articulable facts and the reasonable inferences drawn from them. The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is irrelevant. The manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone. Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm.

Id. at 723-24 (footnotes omitted).

Here, the State argues that regardless of whether this issue is reviewed under plenary review or plain error review, exigent circumstances allowed the police to search Campbell's property quickly, rather than waiting for months in order to obtain corroborating evidence. Although the State urges this court to review the exigent circumstances issue under plenary review, a careful review of the record in this case shows that the State failed to raise the exigent circumstances issue in the trial court.

"Appellate review generally is limited to issues that a party properly preserves for review by raising the issues in the trial court and on appeal." State v. Minor, 546 S.W.3d 59, 64 (Tenn. 2018); State v. Bledsoe, 226 S.W.3d 349, 353 (Tenn. 2007); see Tenn. R. Crim. P. 51; Tenn. R. Evid. 103(a)-(b); Tenn. R. App. P. 13(b), 36(a). "Appellate review preservation requirements ensure that the defense and the prosecution are afforded an opportunity to develop fully their opposing positions on an issue, and such requirements also enable a trial court to avoid or rectify an error before a judgment becomes final." Minor, 546 S.W.3d at 65 (citing Puckett v. United States, 556 U.S. 129, 134 (2009); Bishop, 431 S.W.3d at 43; State v. Jordan, 325 S.W.3d 1, 57-58 (Tenn. 2010)). These preservation requirements "serve to promote fairness, justice, and judicial economy by fostering the expeditious avoidance or correction of errors before their full impact is realized, and in this way, may obviate altogether the need for appellate review." Id. (citing Jordan, 325 S.W.3d at 57-58; United States v. Young, 470 U.S. 1, 15 (1985)).

Although both Lieutenant Taylor and Sergeant Vaden generally testified at the suppression hearing that Galbreath claimed Campbell sent him a pornographic image of Campbell's granddaughter, which created a sense of urgency necessitating a search warrant for Campbell's home, neither officer actually asserted that exigent circumstances supported the search of Campbell's home. In addition, the State never specifically argued, in its response to the motion to suppress or at the suppression hearing, that the exigent circumstances exception to the warrant requirement supported the search of Campbell's home. Significantly, the State never asked the trial court to consider whether the exigent circumstances supported the search of Campbell's home in ruling on the suppression issue. Cf. State v. Jerome Sanders, No. W2014-00989-CCA-R3-CD, 2016 WL 327277, at *7 (Tenn. Crim. App. Jan. 27, 2016) (concluding that although the defense did not include in its motion to suppress the issue of whether officers had tainted the victim's identifications of the defendant by showing the victim the photographic array prior to the defendant's preliminary hearing, the defendant sufficiently preserved this issue for review by questioning the officers and the victims about this issue and by specifically asking the trial court to consider whether officers had tainted the identifications in ruling on the motion to suppress). As a result of the State's actions in this case, the trial court, in denying the

motion to suppress, made no findings as to the existence of exigent circumstances in this case. Because the State failed to raise the exigent circumstances issue in the trial court, we conclude that the State waived its opportunity to raise this issue on appeal.

The State also argues that even if this court decides that the exigent circumstances issue is waived, we should conclude that the trial court committed plain error in suppressing the evidence against Campbell in light of the existence of exigent circumstances.

The plain error doctrine states that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). "To rise to the level of plain error, [a]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." State v. Clayton, 535 S.W.3d 829, 847 (Tenn. 2017) (alteration in original). In order for this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (emphasis added) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The defendant bears the burden of convincing an appellate court that the trial court committed plain error and that the error was sufficient magnitude that it likely changed the outcome of the trial. Clayton, 535 S.W.3d at 848. "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. The State has not provided this court with any authority to support plain error relief under the facts and circumstances of this case. Accordingly, we conclude that the State is not entitled to plain error relief.

## CONCLUSION

Because the affidavit in this case sufficiently established probable cause for issuance of a search warrant for Campbell's home, we reverse the judgment of the trial court,

reinstate the charges against the Campbell, and remand the case for further proceedings consistent with this opinion.

_____
CAMILLE R. MCMULLEN, JUDGE